**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| ALEXANDER DETSCHELT, | ) | CIVIL ACTION NO: _____ |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| NORWIN SCHOOL DISTRICT and | ) | JURY TRIAL DEMANDED |
| WILLIAM BOJALAD, TIMOTHY | ) | |
| KOTCH, SR, MATTHEW THOMAS, | ) | |
| HEATH SHRUM, NINA TOTIN, | ) | |
| RAYMOND KOCAK | ) | |
| | | |
| Defendants. | | |

**<u>COMPLAINT IN CIVIL ACTION</u>**

AND NOW, comes Plaintiff Alexander Detschelt ("Mr. Detschelt"), as *pro se* litigant,

filing this Complaint in Civil Action, and in support thereof avers as follows:


**<u>JURISDICTION</u>**

1.      This action is brought pursuant to (a) **42 U.S.C. § 1983** against the Defendants for

violation of Mr. Detschelt's rights under the First Amendment of the United States Constitution

(Counts I and II) and (b) a Pennsylvania common law claim of **False Light Invasion of Privacy**,

as adopted from Restatement (Second) of Torts (Count III).

2.      Jurisdiction exists pursuant to 28 U.S.C. § 1331, § 1343(a)(3), and § 1367.

3.      Venue is proper pursuant to 28 U.S.C. § 1391(b) because all claims set forth herein

arose in the Western District of Pennsylvania.

1

## PARTIES

4.     Mr. Detschelt is an adult male individual, an attorney, and a resident of Westmoreland County, Pennsylvania.  At all times relevant to this Complaint, Mr. Detschelt was, and is, a duly elected member of the Norwin Board of Education ("the Board").

5.     Defendant Norwin School District (the "District") is a Pennsylvania municipal corporation with administrative offices located at 281 McMahon Drive, North Huntingdon, Pennsylvania 15642.  At all times relevant to this Complaint, the School District acted by and through its duly elected and appointed officials, including, but not limited to, Defendant school board directors William Bojalad (Board President), Timothy Kotch (Board Vice President), Sr., Matthew Thomas, Heath Shrum, Nina Totin, and Raymond Kocak, all members of the Board. (referred to herein as "Defendant Board Members," but collectively with the District as "Defendants").

6.     Mr. Detschelt is also a school board director of the District, having commenced his four-year term as a director in December 2021, with an expiration date for the position set for the end of November 2025.

7.     William Bojalad is an adult male individual and a resident of Westmoreland County, Pennsylvania, who currently resides at 871 Altman St., North Huntingdon, PA 15642. Timothy Kotch, Sr. is an adult male individual and a resident of Westmoreland County, Pennsylvania, who currently resides at 1720 Ridgeview Drive, North Huntingdon, PA 15642. Matthew Thomas is an adult male individual and a resident of Westmoreland County, Pennsylvania, who currently resides at 8438 Walthour Dr., North Huntingdon, PA 15642.  Heath Shrum is an adult male individual and a resident of Westmoreland County, Pennsylvania, who currently resides at 840 Peregrine Dr., North Huntingdon, PA 15642.  Nina Totin, is an adult

female individual and a resident of Westmoreland County, Pennsylvania, who currently resides at 11408 James St., North Huntingdon, PA 15642. Raymond Kocak is an adult male individual and a resident of Westmoreland County, Pennsylvania, who currently resides at 14459 Otis Dr., North Huntingdon, PA 15642.

## FACTS

8.    At all times relevant to this Complaint, Defendant Board Members acted in their capacity as board members of the District (except as set forth with respect to Mr. Detschelt's claims of Defendant Board Members acting in their individual capacity), performed all their work-related job duties and tasks as agents of the District and, in so doing, acted under the color of state law because they exercised official authority granted by county or local law.

9.    In November 2023, the Defendant Board Members (excluding Mr. Kocak) were elected as the majority new board members of the District. The Defendant Board Members (excluding Mr. Kocak) ran as the winning liberal slate of candidates against the losing conservative slate of candidates that Mr. Detschelt supported.

10.    Mr. Detschelt has been a source of contention for the District since before taking office through his present term of office. This prior contentious relationship is outlined in a pending case (2:23-cv-01402 filed in the U.S. District Court for the Western District of Pennsylvania on August 4, 2023) in which Mr. Detschelt had publicly and truthfully criticized District policies, instructional material, the prior Superintendent/administration, and board members in repeated print, television/radio, and online media appearances (locally and nationally), which cast the administration, board, and District in a professionally reputational negative light.

11.    Since January 2024, Mr. Detschelt has been the owner and sole contributor of a Substack blog entitled "Behind Groomer Lines" (behindgroomerlines.substack.com) ("the Blog")

in which he writes articles containing satirical commentary on political and social issues within the Norwin community in which he resides. Mr. Detschelt has also regularly made satirically derogatory, yet accurate, comments in his Blog about individuals or specific groups within Norwin.

12. At the time of filing this lawsuit, there are 21 articles on the Blog, each averaging between 500 and 1500 unique views.

13. The Blog includes criticism on a wide variety of community topics including, but not limited to, liberals, confused Republicans, illegal aliens, COVID controversies, LGBTQ+ agendas, the local swinger community, the Pittsburgh Steelers fan-base, father-daughter dances, lifted Jeep drivers, and the premature installation of holiday decorations.

14. The Blog also includes criticism of the District and its policies, District administration, and Defendant Board Members, based on Mr. Detschelt's personal observations as a private citizen.

15. On January 24, 2025, Mr. Detschelt published an article entitled "Attention Norwin: Trump Needs Your Help!"[1] (the "Article"; a true and correct copy of the relevant text of the Article is attached hereto as Exhibit A).

16. Mr. Detschelt has referred to five of the Defendant Board Members (excluding Mr. Kocak) as the "Manboob 5" at various times throughout his Blog as a play on the words regarding the name of the pop band "Maroon 5" coupled with the conservative stereotype of liberals who are afflicted with gynecomastia due to testosterone deficiency and lack of exercise.

---

[1] Original URL: https://behindgroomerlines.substack.com/p/attention-norwin-trump-needs-your, having been archived by the Internet Archive Wayback Machine at:
http://web.archive.org/web/20250524072938/https://behindgroomerlines.substack.com/p/attention-norwin-trump-needs-your

Mr. Detschelt can provide a true and correct copy of each of his Blog articles if requested by the Court or Defendants.

17.     Due to inexactitude in describing the "several offensive comments of a graphic sexual nature directed to one or more of his fellow female and male School Board Directors" referenced by Defendants in their retaliation, Mr. Detschelt will not speculate which specific comments of the Article are at issue, but for purposes of referencing the Defendant's characterization of Mr. Detschelt's speech, Mr. Detschelt will refer to such as "Comments" hereinafter.[2]

18.     The contents of Mr. Detschelt's Article, including any that may be deemed as "offensive comments of a graphic sexual nature directed to one or more of his fellow female and male School Board Directors," fall under constitutionally-protected speech.  Mr. Detschelt engaged in constitutionally-protected conduct when he published any content on his Blog, including the Comments.

19.     In expressing the Comments ("several offensive comments of a graphic sexual nature directed to one or more of his fellow female and male School Board Directors") and any content on his Blog, Mr. Detschelt was speaking as a private citizen, wherein the Comments were completely unrelated to his duties as a school board director.  Mr. Detschelt was not acting in his official and public capacity as school board director when he published the Comments.  Mr. Detschelt is not an employee of the District.

20.     Subsequent to Mr. Detschelt's posting of this Comments, the District received more than 20 emails from community members who took issue with Mr. Detschelt's Comments.  District Superintendent, Dr. Natalie McCracken, provided a response to each such email indicating that: "The Board of Education received your email input. Please see the response provided by the District's Solicitor, Mr. Lucas:  As the District's Solicitor, my office was informed of the

---

[2] Mr. Detschelt invites the Defendants to provide more specificity as to the Comments.

comments made by Mr. Detschelt *on his webpage* and I am presently consulting with Board leadership regarding next steps. No further comment will be made at present." (emphasis added).

21.    At the February 10, 2025 public school board meeting (the "Censure Meeting"), the District via the Board, presented a published motion as an Action Item for censure of Mr. Detschelt and with majority vote by the Defendant Board Members passed the motion with corresponding published censure resolution (hereinafter referred to collectively as "the Censure" with true and correct copies thereof attached hereto as Exhibits B and C).

22.    The meeting of the Censure was broadcast via the District's YouTube channel, was thereafter adopted into the minutes of record, and was publicly available for streaming through at least September 18, 2025 (having thereafter been removed by the District without a records-retention policy and approximately coincident with the time at which Mr. Detschelt submitted a Right to Know Request for various subject matter relating to the instant lawsuit).

23.    The Censure was part of the meeting agenda that was drafted and/or approved by Board President Mr. Bojalad and/or the Superintendent, Dr. Natalie McCracken.

24.    The Censure Meeting was a workshop meeting (as opposed to legislative meeting) for which detailed minutes were not recorded on a roll-call, voice vote basis.  The board minutes of the February 17, 2025 legislative meeting (a true and correct copy of the relevant portion thereof attached hereto as Exhibit D, showing the Censure vote from the February 10, 2025 meeting) indicate that there were 6 'Yay' votes on the Censure, which constitute a majority vote.[3]

25.    The text of the Censure included:

   a.    "The Board declares that Mr. Detschelt has made comments which are not consistent with the District's core shared values and principles of responsible leadership, including *comments of a graphic sexual nature related to one or more*

---

[3] Mr. Detschelt has a copy of the relevant portions of the Censure Meeting and can provide the Court with a video thereof, showing each of the named Defendant Board Members voting in the affirmative on the Censure if there is a dispute as to the voting record.

*of his fellow female and male School Board Directors, which comments are highly offensive in nature*." (emphasis added)

    b.   "The Board calls on Mr. Detschelt to apologize to his fellow School Board Directors and to members of the community for his offensive and disrespectful comments made about fellow members of the School Board."

    c.   "The Board censures Alexander Detschelt for his conduct and calls on him to resign his office as School Director immediately."

    d.   "The Board removes Mr. Detschelt from any Board committees on which he presently serves."

26.    The text of the Resolution included: "…in a social media post where he was discussing District Board action, School Director Alex Detschelt made several offensive comments of a graphic sexual nature directed to one or more of his fellow female and male School Board Directors."

27.    The Censure was directed to the Comments that had no relevance to the business of the District or any District Board action.

28.    At the Censure Meeting, community speakers spoke up during the agenda discussion portion of the meeting, wherein one of the speakers presented a petition signed by 600 people asking for "formal censure, public condemnation of remarks, or other measures" due to Mr. Detschelt's comments made on his "own personal blog."

29.    Just prior to the vote on the Censure, during discussion of the motion for the Censure, Defendant Board Member, Mr. Kocak said: "if you don't like what he's saying, don't go to his places." Mr. Kocak recognized and informed the board that if they disagree with Mr. Detschelt's speech that they can simply ignore it, yet the District and Defendant Board Members did no such thing and issued and passed the Censure.

30.    There were 761 views of the Censure Meeting as of September 1, 2025.

31.    On February 10, 2025, but prior to the Censure Meeting, a Triblive article was published entitled "Controversial Norwin director faces censure vote again over graphic social media language"[4] that republished the District's characterization of the censure (i.e., "comments of a graphic sexual nature related to one or more of his fellow female and male School Board Directors, which comments are highly offensive in nature.").  Pursuant to TribLive analytics that were shared with Mr. Detschelt, the Triblive article about Mr. Detschelt's censure had the most views of any article on Triblive.com for February 10, 2005.

32.    On February 10, 2025, after the Censure Meeting, another Triblive article was published entitled "Norwin School Board censures controversial director; he vows lawsuit retaliation"[5] that republished the District's characterization of the censure (i.e., "graphic sexual nature").

33.    On February 7, 2025, the District published a publicly-accessible draft agenda of the meeting, including the Censure (that was to be voted on at the February 10, 2025 meeting).

34.    On February 9, 2025, Mr. Detschelt received, via his board email, an email from a Norwin student in which the student wrote:

> "Hey Alex you are a c*nt I hope you get shot 10 times in the foot to the point where you are on the edge of living and then your killer takes a big sh*t on your head and then he cuts ur toes off and runs you over. Your district is sh*t and is getting even sh*ttier. Not at all am I harassing you. Just a quick little f*ck you message that's all F*ck you Alex."[6]

35.    The North Huntingdon Police Department investigated this email on February 10, 2025, and it was communicated to Mr. Detschelt that the parents of the student indicated that they

---

[4] https://triblive.com/local/westmoreland/controversial-norwin-director-faces-censure-vote-again-over-graphic-social-media-language (last accessed November 17, 2025)

[5] https://triblive.com/local/westmoreland/norwin-school-board-censures-controversial-director-he-vows-to-retaliate-with-a-lawsuit (last accessed November 17, 2025)

[6]  expletives censored; Defendant District is aware of this email as they were the initial investigators of it

were made aware of Mr. Detschelt' Comments based on the published proposed Censure that was being circulated within the community and that their son overheard their conversation about the matter, which prompted their son's email to Mr. Detschelt.

36.     Mr. Detschelt did not attend the February 10, 2025 censure meeting, and on February 16, 2025, Mr. Detschelt requested the call-in number for the subsequent meeting due to him feeling physically unsafe at the meeting, as school properties are gun-free school zones, wherein Mr. Detschelt would not be able to adequately provide for his self-defense.

37.     Mr. Bojalad has been the past president of the Norwin Band Aides (the financial booster and support organization helping the Norwin Band) during 2018-2021 and is/has been actively involved with the Norwin Band.

38.     Norwin-based Reflections of Grace Foundation is a 501(c)(3) tax-exempt organization that puts together Norwin's largest fundraising 5k race, known as Race for Grace (RFG), to benefit research of a specific cancerous brain tumor and families affected by such. This race has thousands of participants and spectators.  Prior to each race RFG organizers distribute bags with runner information, shirts/bibs and advertising material from sponsors.  For the April 2023 race, RFG accepted a paid-for political flyer by the Defendant Board Member (excluding Mr. Kocak) slate of candidates, resulting in approximate a thousand flyers being put into the bags. Mr. Detschelt filed an Internal Revenue Service complaint to have the IRS determine if the actions of RFG violated IRS rules by RFG intervening, directly in a political campaign on behalf of candidate(s) for public office per Rev. Rule 2007-41 (accepting monetary donations for publication and distribution of statements / political campaign materials on behalf of candidates for public office). Mr. Detschelt published a dedicated article to this issue on March 10, 2024[7]. On March

---

[7] Original URL: https://behindgroomerlines.substack.com/p/the-irs-violation-by-race-for-grace, having been archived by the Internet Archive Wayback Machine at:

12, 2024, a Triblive article was published entitled "Norwin board member accuses nonprofit of violating IRS rules banning political activity by charities."[8]  This article also described how Congresswoman Summer Lee (accused by Jewish clergy of 'divisive rhetoric' that is 'perceived as openly antisemitic'[9]) attended the grand opening of a business in Norwin co-owned by an ardent supporter of the Defendant Board Members.  Mr. Detschelt provided screenshots in the article of positive Google Reviews of this business made by board members Mr. Bojalad and Nina Totin.

39.    Mr. Detschelt has referred to Defendant Mr. Kocak as "RINO[10] Ray Kocak" in articles dated March 10, 2024 and November 6, 2024.

40.    Beginning with the first article on the Blog through the Article containing the Comments, Mr. Detschelt has criticized and satirically mocked the supporters of the Defendant Board Members.

41.    Starting in November 2024, during school board meetings and through the time of Censure, Mr. Detschelt criticized the extravagance and cost of the proposed new Norwin stadium and proposed an alternative stadium plan that would be approximately half the cost of the proposed original stadium plan.  Defendant Board Members objected (excluding Mrs. Totin and Mr. Kocak), Mr. Detschelt pushed for a vote that the administration bring to the Board an alternative stadium plan at a future meeting for Board consideration.  The support of Mrs. Totin and board member Mrs. Baverso was required for this vote to pass.  This resulted in further negative media attention drawn to the District[11] and was contrary to the more extravagant design envisioned by the

---

https://web.archive.org/web/20250126164150/https://behindgroomerlines.substack.com/p/the-irs-violation-by-race-for-grace

[8] https://triblive.com/local/westmoreland/norwin-school-director-claims-tax-exempt-nonprofit-violated-irs-rules-banning-political-activity (last accessed November 17, 2025)

[9] https://triblive.com/local/regional/pittsburgh-rabbis-urge-rep-summer-lee-to-take-stand-against-hamas-terrorism/ (last accessed November 17, 2025)

[10] An acronym for "Republican in Name Only"

[11] https://triblive.com/local/westmoreland/some-norwin-school-board-members-want-to-scale-back-30m-project-for-stadium-auditorium (last accessed November 17, 2025)

Defendant Board Members (excluding Mrs. Totin and Mr. Kocak). During this timeframe, Mr. Detschelt also criticized the extent and proposed costs of the planned renovation to the auditorium.

42.    At the January 13, 2025 board meeting, board members Mrs. Totin and Mrs. Baverso changed their support for the alternative stadium plan and voted along with the other Defendant Board Members to reject the alternative stadium plan.

43.    At the January 20, 2025 board meeting, Mr. Detschelt argued that proposed District Board Policy 142 (creating a specific program addressing needs and services provided to migrant students) may pose legal consequences to the District, as it may be in conflict with 8 U.S. Code §1324 which prohibits harboring and transporting of illegal aliens. Mr. Detschelt indicated that "migrant" within the proposed District Board Policy did not differentiate between legally and illegally present children, and that it would therefore make sense for Norwin to identify the migrant students and pass that information onto ICE for further determination as to their immigration status.

44.    On January 24, 2025, Mr. Detschelt published the Article that also described his concerns with the Board's adoption of the Policy 142 and how that could "jeopardize the transportation needs of all the legal students in the District by virtue of federal seizure of school buses" pursuant to the penalties associated with §1324.  On January 27, 2025, the Post-Gazette published Mr. Detschelt's concerns as part of a five reporter story entitled "Fear and anxiety ripple through Western Pa. communities amid immigration crackdown" quoting Mr. Detschelt (and naming his Blog) as stating that "the district [should] write a letter to ICE asking what [the District] should be doing in this situation, even if the law is clear on this matter: Illegal -> Get Out."[12]. Mr. Detschelt then updated the Article to include the resultant media publicity.

---

[12] https://www.post-gazette.com/news/social-services/2025/01/27/trump-ice-raid-migrant-immigrant-pennsylvania/stories/202501270074 (last accessed November 17, 2025)

45.     Although, Mr. Detschelt was discussing the actions taken by the Defendant Board Members Board with respect to Policy 142, he did so in his capacity as a private citizen and made clarifying remarks to distinguish his voting actions and criticisms as a Board Member from his criticisms of the Board's adoption of Policy 142 as a private citizen.

46.     Based on the media attention, the Article containing the Comments had more than 14,000 unique views (approximately 14 times more than any other article on the Blog) prior to the Censure.

47.     On February 11, 2025, a day after the Censure, the District solicitor, Mr. Russell Lucas ("Mr. Lucas") sent the Superintendent, Dr. Natalie McCracken, ("Dr. McCracken") an email, containing only a link[13] to an article where a Pennsylvania judge removed five board members of the West Chester school board for mandating masks after the PA Supreme Court ruled that the school mask mandate was unconstitutional.  Dr. McCracken replied to Mr. Lucas: "I'm not sure I even see the relevance or connection with how this would relate to a censure. Two completely different situations."   Mr. Lucas, on behalf of the District and Defendant Board Members, was desperate to find any legal justification, even if not legally supported, to support the Censure.


**COUNT I**

**Plaintiff v. Norwin School District and
William Bojalad, Timonthy Kotch, Sr., Matthew Thomas,
Heath Shrum, Nina Totin, and Raymond Kocak (as Individuals)**

***U.S.C. §1983 -- Retaliation in violation of First Amendment***

---

[13] https://whyy.org/articles/chester-county-judge-tosses-5-members-of-west-chester-school-board-over-masks (last accessed November 17, 2025)

48.     The preceding paragraphs of this Complaint are incorporated by reference as if fully set forth herein.

49.     The School District lacks authority to impose values (core or otherwise), principles of responsible leadership, or acceptable speech upon private citizens within the community.

50.     The right to post political parody and satirical commentary, including non-defamatory, satirically derogatory comments, non-threatening in nature and nowhere near "hate speech," is free speech that was clearly established by law to be protected by the First Amendment at the time the District and Defendant Board Members issued the Censure.

51.     None of the Comments ("several offensive comments of a graphic sexual nature directed to one or more of his fellow female and male School Board Directors") in the Article related to the substance of Board Action or District matters.

52.     Mr. Detschelt is free to make "several offensive comments of a graphic sexual nature directed to one or more of his fellow female and male School Board Directors" without fear of retaliation for such comments as a private citizen and unrelated to his duties as a school board director.

53.     Mr. Detschelt, as a board member, has never made "several offensive comments of a graphic sexual nature directed to one or more of his fellow female and male School Board Directors."

54.     The Defendant Board Members and/or the District devised, drafted, and passed the Censure concerning Mr. Detschelt's Comments in retaliation for Mr. Detschelt's (1) satirically derogatory comments of Defendant Board Members; (2) political parody and satirical commentary; (3) satirically derogatory comments of Defendant Board Members' supporters including Mr. Bojalad's band community and filing an IRS complaint against one such supporter;

(4) public criticism of Board Policy 142 and publicly indicating the potential legal ramifications associated therewith; (5) repeated public criticism of the new stadium and auditorium plans; (6) repeated print and online media appearances where his above-criticisms of the District, Defendant Board Members, and its administration were presented; (7) referring to Defendant Mr. Kocak as "RINO Ray Kocak"; (8) public exposure of Mr. Bojalad and Mrs. Totin being associated with a business that brought in a polarizing congresswoman widely accused of employing anti-semitic rhetoric; and (9) public criticism of the District and its policies throughout his term and the filing of the prior pending lawsuit against the District, whereas Defendant Board Members and/or the District would not have devised, drafted, and passed the Censure concerning his protected speech as a private citizen absent those retaliatory motives.

55.    Defendant Board Members and/or the District devised, drafted, and passed the Censure concerning Mr. Detschelt's Comments, which, although Mr. Detschelt demonstrates more than ordinary firmness and resolve, has adversely affected Mr. Detschelt's protected speech as a private citizen, making him far more reluctant to criticize the Defendant Board Members and/or the District and its policies, under ongoing trepidation if such protected speech as a private citizen may result in being singled out by the Defendant Board Members and/or the District and being subjected to District-initiated derision and public threats, as in the instant case.

56.    Defendant Board Members and/or the District devised, drafted, and passed the Censure concerning Mr. Detschelt's Comments with the sole purpose and effect of punishment and as a punitive sanction for Mr. Detschelt's storied and continued criticism of the administrative regime of the School District, thereby attempting to chill and deter Mr. Detschelt from engaging in future speech and expressive conduct protected by the First Amendment, including any future criticism of the administrative regime of the School District.

57. The District's Censure adversely affected Mr. Detschelt's protected speech as a private citizen, and as a result of the District's Censure concerning Mr. Detschelt's Comments, Mr. Detschelt received significant backlash from the community including, among other things:

    a. the February 10, 2025 meeting at which the Censure occurred had speakers speaking in favor of the Censure, directing their anger toward Mr. Detschelt and demanding that he be "held accountable" by the District;

    b. an email from a student indicating that he wishes that physical violence be bestowed upon Mr. Detschelt;

    c. Mr. Detschelt has received reputationally harmful media coverage; and

    d. Mr. Detschelt's reputation is negatively affected and his ability to fairly present himself to the public in a future election has been severely diminished due to the District's Censure, and the negative publicity resulting therefrom.

58. On behalf of the School District, the Defendant Board Members in their official capacity and/or as individuals, intentionally devised, drafted, and passed the Censure with full knowledge, awareness, and the expectation that the above-mentioned incidents of backlash and future harm would almost certainly occur and that Mr. Detschelt would be subject to criticism and threats, and have his reputation harmed.

59. Consequently, such backlash and future harm was the natural, predictable, and foreseeable effect of the District's Censure, and the District and the Defendant Board Members retaliated against Mr. Detschelt for exercising his protected speech as a private citizen under the First Amendment.

60. The Defendants retaliated against Mr. Detschelt as a private citizen with an official government act (under color of law) that was of a particularly virulent character, specifically, that of intimidation, intimating that punishment, sanction, or regulatory action will follow, with such in fact occurring due to:

a. Mr. Detschelt being sanctioned for private citizen speech via the Censure by the District; and

b. The Censure being an intimidation of Mr. Detschelt with respect to any future private citizen speech of Mr. Detschelt's that the School District disagrees with.

61.    The Defendants qualified the Censure as "in his capacity as a member of the Board of School Directors" in an attempt to conceal that the Censure was in regard to Mr. Detschelt's protected speech as a private citizen.

62.    Based on Mr. Detschelt's prior actions, comments, repeated print and online media appearances, etc. the Censure was a convenient excuse for retaliation against Mr. Detschelt and public humiliation of Mr. Detschelt from a population at large (via ensuing media coverage), as there was no other way to regulate his private citizen speech but for the use of the Censure.

63.    The Defendants knew that negative publicity and other harm would ensue via a School Board based censure based on Mr. Detschelt's regular presence in print and digital newspaper media from his involvement with issues legitimately concerning school board matters.

64.    The conduct and actions of Defendants set forth above were sufficient to deter any reasonable person of ordinary firmness from exercising his or her constitutional rights. The conduct and actions of Defendants did, in fact, hinder Mr. Detschelt in his ability to engage in free speech with the ongoing trepidation as to whether such protected speech as a private citizen may result in being singled out, again, in the future, by Defendant Board Members and/or the School District and being subjected to District-initiated derision broadcast to a population at large, as in the instant case.

65.    The Defendant Board Members and/or District had sufficient opportunity over the course of 12 prior articles over a period of more than a year to censure Mr. Detschelt over other

comments contained in the Blog, which anyone in the opposing political party might subjectively deem "highly offensive" or of a "graphical sexual nature."

66.     Notwithstanding that the District lacks authority to impose values, principles of responsible leadership, or acceptable speech upon private citizens within the community, many of Mr. Detschelt's prior comments within the 12 prior articles are not "consistent with the District's core shared values and principles of responsible leadership" (which was the basis for the Censure with respect to the Comments, as outlined in the Resolution).

67.     The Defendant Board Members and/or District did not censure Mr. Detschelt for any of the prior comments because they understood that was private citizen speech.  The Defendants only issued a censure after Mr. Detschelt started making satirically derogatory comments specifically about the Defendant Board Members.

68.     The non-objective approach to "highly offensive" speech demonstrates that the Defendant Board Members were using the power of their elected official positions to officially retaliate against Mr. Detschelt based on his Comments about them.  The Censure specifically qualified the "highly offensive" speech as comments "directed to one or more of his fellow female and male School Board Directors."

69.     Mr. Detschelt's ability to employ satirically derogatory comments while describing Defendant Board Members is constitutionally protected, and it is entirely irrelevant if Defendant Board Members view speech directed to them as "highly offensive" or of a "graphic sexual nature."

70.     Mr. Detschelt's private citizen speech is constitutionally protected. The Norwin School Board is described as "a policy-making body whose primary function is to formulate and evaluate policies necessary for the cost-effective and efficient operations of the School District."[14]

---

[14] https://www.norwinsd.org/apps/pages/index.jsp?uREC_ID=1140949&type=d&pREC_ID=2546403 (last accessed November 17, 2025)

The criticism of a private citizen's speech is not a discretionary function of any school board including Defendant Board Members, and such criticism does not align with the operational purpose of the District, namely, the formulation and evaluation of policies for the operation of the District.

71.    Drafting and passing the Censure to humiliate and punish Mr. Detschelt based on his satirically derogatory comments that did not relate to District business or Board matters is neither an action that is taken in the course of the Defendant Board Members' duties or powers nor within the scope of their authority.

72.    The Defendant Board Members understood the established right of Mr. Detschelt's private citizen speech, especially after a finding by the court in pending case 2:23-cv-01402 that Mr. Detschelt spoke as a private citizen.   At the time of the Censure in this case, the only outstanding issue in the pending case was whether the censure constituted a retaliatory act. Defendant Board Members were aware at the time of the Censure in this case that the pending case was not ruled on with prejudice and that Mr. Detschelt had filed an amended complaint in the prior month.

73.    Prior to the Censure, in relation to the Article Mr. Detschelt posted, various emails were received by the District where critics of Mr. Detschelt acknowledged his private citizen speech, where it was indicated that: "[Mr. Detschelt] *maintains a personal blog*"; "…he speaks of in such derogatory and inflammatory language *in his personal* yet very public statements through his online personas and in media interviews"; "attempts to make the *comments under the guise that he is speaking as just a citizen* within the community"; and "hate speech he has been spreading on *his substack account*." (emphasis added)

74.     The right to engage in the above-mentioned speech was so apparent that any reasonable public official, standing in the shoes of Defendant Board Members, would understand and recognize that issuing the Censure constituted unlawful retaliation in violation of Mr. Detschelt's First Amendment right of free speech.

75.     As a direct and proximate result of the Defendants' unreasonable and unlawful actions, Mr. Detschelt has suffered, and continues to suffer, substantial past and future damages, both compensatory and general, including, but not limited to, severe emotional distress, mental anguish, embarrassment, and humiliation.

**COUNT II**

**Plaintiff v. Norwin School District**

*U.S.C. §1983 -- Retaliation in violation of First Amendment*

76.     The preceding paragraphs of this Complaint are incorporated by reference as if fully set forth herein.

77.     On January 29, 2025, Mr. Detschelt was made aware via email letter to his board email address from Mr. Lucas" that Mrs. Totin forwarded an "unlawful harassment" complaint ("Totin Complaint") to the District about Mr. Detschelt's Article.  Mrs. Totin claimed that the Article "created a hostile and unsafe environment and have publicly sexually harassed Mrs. Totin through comments [Mr. Detschelt] made regarding her body and other specific graphic sexual references."  Upon receipt of this email letter, the same day, Mr. Detschelt replied in email:

> "Dear Russ,
> The Board is confused, as they are conflating my private opinion (blog posts) with
> my board actions. Have a nice day.
> Alex"

78.     At the Censure meeting, the District via, the Board, presented a second published motion (adjacent to the Censure motion) as a Second Action Item (also passing) that "the Board approve the engagement of Thomas, Thomas & Hafer LLP as special legal counsel at the Board's direction at the hourly rates of $225 per hour for partners, $185 per hour for associates and $100 per hour for paralegals" to investigate the Totin Complaint against Mr. Detschelt, resulting in the District spending over $7000 of taxpayer money to investigate private citizen speech.

79.     The day of and day after the Censure, Mr. Detschelt updated the Article via links to media articles covering the Censure and his intent to sue based thereon.

80.     On April 24, 2025, Mr. Detschelt published an article entitled "Norwin is FAQed" [15] in which he criticized the Defendant Board Members, the District, and Mr. Lucas regarding the Censure.  Mr. Detschelt was once again forced to speculate as to which portions of his protected speech gave rise to the Censure.

81.     In the same article, Mr. Detschelt referred to the Defendant Board Members as "retarded, communist, faggots indeed being responsible for driving policy for the education of our District's children," published copies of letters referencing the Totin Complaint, and characterized the Defendant Board Members' actions concerning the Totin Complaint as:

> "The Board took a baseless and defamatory complaint seriously, republished the defamation outside of the Board by virtue of the censure (resulting in further broadcast through media attention), and used taxpayer funds to investigate this baseless and defamatory complaint."

82.     In the same article, Mr. Detschelt included a screenshot of an email from Mr. Lucas to Mr. Detschelt's board email address from April 14, 2025 in which Mr. Lucas stated that:

---

[15] Original URL: https://behindgroomerlines.substack.com/p/norwin-is-faqed, having been archived by the Internet Archive Wayback Machine at:
https://web.archive.org/web/20250525042028/https://behindgroomerlines.substack.com/p/norwin-is-faqed

"I wanted to give you the same report I provided to the Board in Executive Session tonight. The outside investigator has submitted his report regarding the Complaint filed against you and has determined that there was no violation of applicable anti-harassment/anti-discrimination statute *(sic)* based on a finding that (1) those statutes aren't applicable to elected officials, and (2) the comments weren't sufficiently severe or pervasive. The investigator did indicate that these types of comments, if continued, 'will likely result in further complaints from District officials, employees and residents and expose him and the District to claims (whether or not they are defensible), including the cost of defending the same, and potential liability.' I told the Board we consider this matter to be resolved."

83. Mrs. Baverso and Mr. Kocak ran with Mr. Detschelt on the same "Change4Norwin" conservative slate of board candidates in 2021, with billboard and election campaign slogans being "fiscal responsibility" and "against new taxes."

84. Mr. Detschelt became disappointed that Mrs. Baverso was in favor of the extravagant new stadium and auditorium renovation that would be a financial burden on taxpayers, necessitating continued tax increases to cover the resultant District bond debt payments.

85. It was only after Mrs. Baverso voted for the new stadium at the April 14, 2025 meeting that Mr. Detschelt began to criticize Mrs. Baverso on his Blog. Up until the April 24, 2025 article entitled "Norwin is FAQed," Mr. Detschelt never mentioned Mrs. Baverso on his Blog.

86. In the same ""Norwin is FAQed" article, Mr. Detschelt included a subsection entitled "Is it true that board member Christine Baverso has turned into a RINO?" which included the following:

"No. This is absolutely untrue and the rumors need to stop. Christine Baverso has not turned into a RINO because one can't turn into a RINO if one has always been one."

In this article, Mr. Detschelt continued to criticize what he felt were RINOs on the board, including referring to Mr. Kocak as "RINO Ray" and characterizing Mrs. Baverso as one who "couldn't be

trusted to consistently vote along Republican lines with her fence-sitting and easily-influenced, crowd-pleasing desire."

87.    At the May 19, 2025 Board meeting, Mr. Detschelt signed up to speak as a private citizen at the speaker's podium during the non-agenda public comment section of the meeting.[16] Mr. Detschelt discussed his concern that if a board member supported the extravagant new stadium and auditorium renovation (and rejected the cheaper, alternate stadium proposal), yet is now indicating that they will vote against the proposed tax increase (alluding to Mrs. Baverso), that such a person would be a "hypocrite." At that moment, Mrs. Baverso rushed out of the meeting board room.

88.    The June 23, 2025 Board meeting was the meeting at which the Defendant Board Members (excluding Mr. Kocak) voted to raise taxes to the maximum limit allowed by law. The District's Police Officer (a police officer hired full-time by the District and referred to as "School Resource Officer" or "SRO"), and Officer Kari Bauer of the North Huntingdon Police Department were present for security purposes, with each person gaining entry to the meeting being wanded by either one of the officers.  Prior to the public session of the meeting, an executive session was held.  Prior to the start of the executive session Mr. Detschelt spoke privately to Mrs. Baverso. During the executive session, Mr. Lucas asked Mr. Detschelt to leave the room because he wished to poll the Board (minus Mr. Detschelt) as to whether the District should authorize his law firm to provide Mr. Detschelt with a Rule 11 Sanction Motion in Mr. Detschelt's pending lawsuit against the District.  Various board members eventually came out of the board room, with Mrs. Baverso, Mr. Bojalad, Dr. McCracken, and Mr. Lucas remaining in the board room.  The SRO and Officer Kari Bauer then entered the board room and the door was closed again.  Although Mr. Detschelt

---

[16] Mr. Detschelt can provide the Court with a video of the relevant portion of this meeting as the District removed public access to the video of this meeting.

was waiting in the lobby with the door to the board room closed, Mr. Detschelt overhead Mrs.Baverso, apparently in distress. After approximately 5 minutes, with Mr. Detschelt still in the lobby, the board room door opened up and the SRO came out and told Mr. Detschelt to step into a private room directly opposite the board room. Mr. Detschelt indicated that he would talk in the lobby, but was met with a motioning hand gesture by the SRO to proceed into the other room. Mr. Detschelt complied with the officer's instructions due to the power imbalance he felt from the presence of two police officers. The SRO, Officer Bauer, Dr. McCracken, and Mr. Lucas were the only individuals in the room with Mr. Detschelt. Upon closing the door, the SRO lashed out in a strong, loud tone, and intimidating manner: "What did you say to make her upset?" Mr. Detschelt calmly stated: "I'm not responsible for the emotions of others" and proceeded towards the door. Mr. Lucas then stepped in front of the door, blocking Mr. Detschelt's exit, while the SRO Officer took a step toward Mr. Detschelt to close any remaining gap as Mr. Detschelt was moving toward the door. Mr. Detschelt looked at the SRO and asked him if he was being detained, to which the SRO rolled his eyes and responded: "So we're doing this now?" Mr. Detschelt then said, "You're being accusatory." Officer Bauer attempted to de-escalate the situation created by the SRO and interjected with: "We just want to make sure that you're not saying anything that causes or will cause a public disturbance." Mr. Detschelt turned his attention to Officer Bauer and replied; "Of course I wouldn't say anything that would cause a disturbance" and again stated: "I am not responsible for the emotions of others." The path to the door was cleared and Mr. Detschelt proceeded to leave the room.

89.    The SRO is an employee of the District with the ability to detain individuals, having limited arrest authority, and being licensed to carry a firearm.

90.    Mr. Lucas is a paid agent of the District when acting on their behalf on legal matters. Mr. Lucas injected his presence during a discussion in the board room with Mrs. Baverso (and Mr. Bojalad and Dr. McCracken) behind closed doors and then injected his presence, alongside that of the Dr. McCracken, during the questioning of Mr. Detschelt by the SRO.

91.    The District contracts with the North Huntingdon Police Department (NHTPD) to provide additional officer presence, when necessary. The District paid NHTPD for the services of Officer Kari Bauer for June 23, 2025.

92.    One June 24, 2025, Mr. Detschelt submitted a complaint via email to Mr. Bojalad, Dr. McCracken, and Mr. Lucas (the "Email Complaint"; a true and correct copy of this Email Complaint is attached hereto as Exhibit E) memorializing the sequence of events of June 23, 2025.

93.    Up to the filing of this Complaint, Mr. Detschelt did not receive any correspondence disputing his Email Complaint or the sequence of events set forth therein.

94.    On August 18, 2025, Mr. Detschelt received an email from Mr. Lucas informing him that because "the complaint below does not relate to any Board policy or applicable education or employment-related law or regulation" and after discussion with the Board, that the Board has "declined to authorize an investigation 0-6, with one abstention."

95.    Mr. Detschelt was acting as a private citizen (both on his Blog and at the speaker's podium) when he criticized Mrs. Baverso's voting record, hypocrisy, and RINO behavior.

96.    Mr. Detschelt's ability to speak freely with and associate with Mrs. Baverso prior to any official meeting is constitutionally protected conduct. Mr. Detschelt did not interfere with any business of the District or the board when speaking to Mrs. Baverso, as the board meeting had not yet commenced.

97.     The ability to speak freely and associate without fear of retaliation from the government is guaranteed under the First Amendment.

98.     Mr. Detschelt was retaliated against by the District:

    a.  using its SRO to press Mr. Detschelt into the private room even after Mr. Detschelt indicated that he would talk in the lobby instead;

    b.  using Mr. Lucas to prevent Mr. Detschelt from leaving the private room after Mr. Detschelt had refused to continue any conversation and indicated as such by walking to the door to exit the private room; and

    c.  using its SRO to continue to confront Mr. Detschelt and assist Mr. Lucas in preventing Mr. Detschelt from leaving the private room after Mr. Detschelt had refused to continue any conversation and indicated as such by walking to the door to exit the private room.

99.     The District administration, for almost a year prior to the vote on the new stadium, had touted the need for a new stadium via presentations to the board showing the current state of the existing stadium, the amount of facility requests associated with the existing stadium, and the type of events that a new stadium could host, including band competitions.

100.    But for Mrs. Baverso's fifth vote in favor of the extravagant new stadium, the interests of the administration and board members in favor of the new stadium would not have been achieved.

101.    It should be of no concern to a school district the private speech between two adults, like Mrs. Baverso and Mr. Detschelt, yet the District took it upon themselves to investigate such and then act on Mrs. Baverso's emotional response by retaliating against Mr. Detschelt.

102.    In light of Mrs. Baverso's crucial and favorable vote resulting in new stadium construction, this retaliation was an attempt to defend Mrs. Baverso and to punish Mr. Detschelt for his criticism of Mrs. Baverso's voting record, hypocrisy, and RINO behavior.

103.    The District simply found another opportunity on June 23, 2025 to continue to retaliate against Mr. Detschelt for his numerous prior actions throughout his term over the past 3+ years that the District and other board members disagreed with.

104.    The conduct and actions of the Defendant above were sufficient to deter any reasonable person of ordinary firmness from exercising his or her constitutional rights – via the use of a District police officer and agents operating under color of law to intimidate an individual from speaking freely and freely associating with anyone, as guaranteed by the First Amendment. The conduct and actions of the Defendant did, in fact, result in Mr. Detschelt no longer speaking with or about Mrs. Baverso in person prior to or during any meeting, knowing that a police presence was in place at those subsequent meetings that could once again be used to intimidate him.

105.    As a direct and proximate result of the Defendants' unreasonable and unlawful actions, Mr. Detschelt has suffered, and continues to suffer, substantial past and future damages, both compensatory and general, including, but not limited to, severe emotional distress, mental anguish, embarrassment, and humiliation.


**COUNT III**

**Plaintiff v. William Bojalad, Timonthy Kotch, Sr., Matthew Thomas, Heath Shrum, Nina Totin, and Raymond Kocak (as Individuals)**

***Pennsylvania Common Law Right of False Light Invasion of Privacy***

106.    The preceding paragraphs of this Complaint are incorporated by reference as if fully set forth herein.

107.    The Censure, by way of the Resolution, states that "School Director Alex Detschelt made several offensive comments of a graphic sexual nature directed to one or more of his fellow female and male School Board Directors," however, *School Director* Alex Detschelt never made any "offensive comments of a graphic sexual nature directed to one or more of his fellow female and male School Board Directors." *School Director* Alex Detschelt never made any offensive comments of a "graphic sexual nature" directed to anyone.

108.    At the Censure meeting, the District, via the Board, presented a second published motion (adjacent to the Censure motion) as a Second Action Item (also passing) that "the Board approve the engagement of Thomas, Thomas & Hafer LLP as special legal counsel at the Board's direction at the hourly rates of $225 per hour for partners, $185 per hour for associates and $100 per hour for paralegals" to investigate the Totin Complaint against Mr. Detschelt, resulting in the District spending over $7000 of taxpayer money to investigate private citizen speech.

109.    The District, via direction by the Board, investigated the Totin Complaint only after the Censure, with a resultant finding that "the outside investigator has… determined that there was no violation of applicable anti-harassment/anti-discrimination statute *(sic)* based on a finding that (1) those statutes aren't applicable to elected officials, and (2) the comments weren't sufficiently severe or pervasive."

110.    Mr. Detschelt's private citizen speech is constitutionally protected. The Norwin School Board is described as "a policy-making body whose primary function is to formulate and evaluate policies necessary for the cost-effective and efficient operations of the School District." The criticism of a private citizen's speech is not a discretionary function of any school board

including Defendant Board Members, and such criticism does not align with the operational purpose of the District, namely, the formulation and evaluation of policies for the operation of the District.

111.    Drafting and passing the Censure to humiliate and punish Mr. Detschelt based on his satirically derogatory comments that did not relate to District business or Board matters is neither an action that is taken in the course of the Defendant Board Members' duties or powers nor within the scope of their authority.

112.    Any reasonable person, prior to the Censure, would understand that neither the District nor Defendant Board Members have jurisdiction over private citizen speech, such as Mr. Detschelt's, made regarding one of its elected school board members, yet the Defendant Board Members issued the Censure regardless of this knowledge, or at least prematurely, without waiting from the outside investigator determination as to Mrs. Totin's claim of "sexual harassment" against Mr. Detschelt.

113.    The EEOC defines sexual harassment as making "unwelcome sexual advances, requests for sexual favors, and other verbal or physical harassment of a sexual nature" with respect to employees or applicants and that "[i]t is unlawful to harass a person (an applicant or employee) because of that person's sex.[17]

114.    The Totin Complaint was baseless and defamatory in and of itself because:

    a.    Nothing in the Article was of a sexually harassing nature, which was confirmed by the outside investigator;

    b.    Mr. Detschelt has never sexually harassed anyone, let alone a board member, in his capacity as either a board member or a private citizen; and

    c.    Mrs. Totin accused Mr. Detschelt of committing a crime, which was factually false.

---

[17] https://www.eeoc.gov/sexual-harassment (last accessed November 17, 2025)

115.    The Defendant Board Members had the opportunity to wait for the outside investigator's determination as to the merits of the Totin Complaint, but instead, chose to take the baseless and defamatory Totin Complaint seriously.

116.    The Defendant Board Members then failed to keep the Totin Complaint confidential, which resulted in Mr. Detschelt's Comments being reported in the community and the media as relating to "sexual harassment."

117.    The second Triblive article published February 10, 2025 entitled "Norwin School Board censures controversial director; he vows lawsuit retaliation" also mentioned that "a Pittsburgh law firm, was hired as a special legal counsel to handle a complaint that Totin had filed with the district against Detschelt, alleging sexual harassment."

118.    One of the speakers at the Censure meeting, who was aware of the published meeting agenda prior to the Censure, stated that she is presenting "a petition signed by over 600 members of the Norwin community urging the Norwin School Board to take immediate and appropriate action against fellow board member Alex Detschelt…" and that "Mr. Detschelt's words are divisive, hurtful, and could send a message to our students that discrimination, bullying, and *sexual harassment* is acceptable" (emphasis added).

119.    Pursuant to TribLive analytics that were shared with Mr. Detschelt, the Triblive article about Mr. Detschelt's censure had the most views of any article on Triblive.com for February 10, 2005. There were 761 views of the Censure Meeting as of September 1, 2025.

120.    Defendant Board Members knew that negative community and media publicity would ensue from issuing a Censure that when taken in the context of the leaked Totin Complaint would create the false impression that Mr. Detschelt sexually harassed a board member.

121.    To deliberately amplify the reputational harm to Mr. Detschelt, inflame the community, and attempt to mischaracterize any subsequent media portrayal of the exact behavior of Mr. Detschelt, the Censure placed Mr. Detschelt in a false light by making false statements and omitting contextual and factual information that was necessary for a reasonable person to actually assess the totality of the circumstances and the nature of Mr. Detschelt's behavior.

122.    Although none of the Comments ("several offensive comments of a graphic sexual nature directed to one or more of his fellow female and male School Board Directors") in the Article related to the substance of Board Action or District matters, the Censure indicated that it was "where he was discussing District Board action" that "School Director Alex Detschelt made several offensive comments of a graphic sexual nature directed to one or more of his fellow female and male School Board Directors," which further gives the false impression that Mr. Detschelt was acting in his capacity as a board member when making the Comments.

123.    In addition to the absence of contextual information and being factually incorrect, the Censure included wording:

> "The Board declares that Mr. Detschelt has made comments which are not consistent with the District's core shared values and principles of responsible leadership"

which gave false the impression that Mr. Detschelt, in his capacity as a board member, was not following the District's core shared values and principles of responsible leadership.

124.    The Censure also included wording:

> "The Board calls on Mr. Detschelt to apologize to his fellow School Board Directors and to members of the community for his offensive and disrespectful comments made about fellow members of the School Board.  The Board censures Alexander Detschelt for his conduct and calls on him to resign his office as School Director immediately.   The Board removes Mr. Detschelt from any Board committees on which he presently serves."

This language of asking for an apology from Mr. Detschelt gave the false impression that Mr. Detschelt, as a board member, was being punished by the Defendant Board Members for his behavior as a board member.

125.    The Defendant Board Members were presented with emails (containing Mr. Detschelt's Article, either verbatim or a link thereto) from multiple community members more than a week prior to the Censure where critics of Mr. Detschelt acknowledged his private citizen speech, where it was indicated that: "[Mr. Detschelt] *maintains a personal blog*"; "…he speaks of in such derogatory and inflammatory language *in his personal* yet very public statements through his online personas and in media interviews"; "attempts to make the *comments under the guise that he is speaking as just a citizen* within the community"; and "hate speech he has been spreading on *his substack account*." (emphasis added)

126.    The Defendant Board Members, having been provided with the Article well in advance of the Censure along with community emails describing the nature of the Comments, were fully aware that the Comments were not made by "School Director Alex Detschelt," but rather by Mr. Detschelt as a private citizen on his personal Blog.

127.    Just prior to the vote on the Censure, during discussion of the motion for the Censure, Defendant Board Member, Mr. Kocak said: "if you don't like what he's saying, don't go to his places." Mr. Kocak recognized and informed the board that if they disagree with Mr. Detschelt's speech that they can simply ignore it, yet the District and Defendant Board Members did no such thing and issued and passed the Censure.

128.    The Defendant Board Member's actions and speech conveyed a false impression (implying a falsehood) -- due to the Censure's selective wording, absence of context, and misstating of the facts, along with leaking (republishing) a baseless and defamatory complaint, it

fails to allow a reasonable person to actually assess the totality of the circumstances and the nature

of Mr. Detschelt's behavior, thereby leaving a reasonable person to believe that Mr. Detschelt:

    a.   sexually harassed a board member (which he did not in any capacity), something a reasonable person would view as highly offensive if it were true;

    b.   as an elected official (board member), made "several offensive comments of a graphic sexual nature directed to one or more of his fellow female and male School Board Directors" (which he did not), something a reasonable person would view as highly offensive if it were true;

    c.   as an elected official (board member), was not following the District's core shared values and principles of responsible leadership based on the Comments attributed to him as a board member (which he was following); and

    d.   as an elected official was being punished based on the Comments attributed to him as a board member

    129.   Due to the false-light impression by the Defendant Board Members, Mr. Detschelt

was subjected to community derision and a threat:

    a.   One of the speakers at the Censure meeting stated that "Mr. Detschelt's words are divisive, hurtful, and could send a message to our students that discrimination, bullying, and *sexual harassment* is acceptable" (emphasis added).

    b.   Another speaker at the Censure meeting began her speech by stating that "In reference to the censure of Mr. Detschelt, I think it is time that members of the Norwin School Board are held to at least the same standards the student body are expected to uphold" and then asked how "the discipline policy at Norwin would have a student appear in front of the board of directors, including Mr. Detschelt, and allow him to be a part in [determining the discipline of the student], a man that can't even be expected to apologize for using a slur is going to implement a discipline policy?... I hardly think so."

    c.   On February 9, 2025, after the meeting agenda containing the proposed Censure was published by the District, Mr. Detschelt received via his board email address an email from a Norwin student in which the student wrote:

> *"Hey Alex you are a c\*nt I hope you get shot 10 times in the foot to the point where you are on the edge of living and then your killer takes a big sh\*t on your head and then he cuts ur toes off and runs you over. Your district is sh\*t and is getting even sh\*ttier. Not at all am I harassing you. Just a quick little f\*ck you message that's all F\*ck you Alex."*

130.    The type of inflamed community reactions elicited in response to the Censure evidenced that the audience viewed the false impression of Mr. Detschelt's speech as highly offensive and had the false impression that Mr. Detschelt, as a board member, made the Comments, and specifically, that the Comments involved sexual harassment.

131.    Defendant Board Members selectively published highly offensive material, with knowledge or in reckless disregard of the falsity of the material, to create a false impression and/or false light in which it would place Mr. Detschelt. The false light in which the Censure and leaked Totin Complaint put Mr. Detschelt resulted in Mr. Detschelt's reputation being negatively affected, being viewed as:

a.    an individual and a board member who has sexually harassed a board member, thereby committing a crime; and

b.    as an elected official making "several offensive comments of a graphic sexual nature directed to one or more of his fellow female and male School Board Directors."

132.    Notwithstanding the aforementioned knowledge or reckless disregard as to falsity or false light, the Defendant Board Members were further motivated by malice in publishing the Censure and leaked Totin Complaint based on Mr. Detschelt's (1) satirically derogatory comments of Defendant Board Members; (2) political parody and satirical commentary; (3) satirically derogatory comments of Defendant Board Members' supporters including Mr. Bojalad's band community and filing an IRS complaint against one such supporter; (4) public criticism of Board Policy 142 and publicly indicating the potential legal ramifications associated therewith; (5) repeated public criticism of the new stadium and auditorium plans; (6) repeated print and online media appearances where his above-criticisms of the District, Defendant Board Members, and its administration were presented; (7) referring to Defendant Mr. Kocak as "RINO Ray Kocak"; (8)

public exposure of Mr. Bojalad and Mrs. Totin being associated with a business that brought in a polarizing congresswoman widely accused of employing anti-semitic rhetoric; and (9) public criticism of the District and its policies throughout his term and the filing of the prior pending lawsuit against the District.

133.    Mr. Detschelt's reputation is negatively affected and his ability to fairly present himself to the public in a future election has been severely diminished due to the Censure, and the negative publicity resulting therefrom.

134.    As a direct and proximate result of the Defendants' unreasonable and unlawful actions, Mr. Detschelt has suffered—and continues to suffer—substantial past and future damages, both compensatory and general, including, but not limited to, severe emotional distress, mental anguish, embarrassment, and humiliation.

WHEREFORE, Plaintiff Alexander Detschelt respectfully requests that this Court enter judgment in his favor and award Plaintiff:

(a) compensatory damages, costs incurred in this proceeding, and attorney's fees with respect to Counts I, II, and III;

(b) punitive damages with respect to William Bojalad, Timothy Kotch, Sr., Matthew Thomas, Heath Shrum, Nina Totin, and Raymond Kocak acting in their *individual* capacity with respect to Counts I and III; and

(a) further, grant such other relief that the Court deems just, equitable, or proper.

Respectfully submitted,

By:    /s/Alexander Detschelt
Alexander Detschelt
as *pro-se* litigant

8035 Natalie Lane
North Huntingdon, PA 15642
(412) 805-2539
adetschelt@hotmail.com